1
2
3
4
5
6
7               UNITED STATES DISTRICT COURT

8                 EASTERN DISTRICT OF CALIFORNIA

9
GLEN M. JOHNSON,                    1:12-CV-01178 AWI BAM HC
10
                      Petitioner,
11                                        FINDINGS AND RECOMMENDATION
        v.                                REGARDING PETITION FOR WRIT OF
12                                        HABEAS CORPUS
13   G. SWARTHOUT,

14                      Respondent.
                                    /
15

16       Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17   pursuant to 28 U.S.C. § 2254.

18                        **PROCEDURAL BACKGROUND**[1]

19       Petitioner is currently in the custody of the California Department of Corrections and

20   Rehabilitation pursuant to a judgment of the Superior Court of California, County of Kern,

21   following his conviction by jury trial on March 27, 2008, of second degree murder (Cal. Penal

22   Code § 187(a)), conspiracy to commit murder (Cal. Penal Code § 182(a)(1)), and accessory to

23   murder (Cal. Penal Code § 32).  Allegations that the principal had been armed with a firearm

24   (Cal. Penal Code § 12022(a)(1)) and that Petitioner had previously served a prior prison term

25   (Cal. Penal Code § 667.5(b)) were found true.  On May 15, 2008, he was sentenced to serve an

26   aggregate term of twenty-seven years to life in state prison.

27   _____

28          [1]This information is derived from the petition for writ of habeas corpus, Respondent's answer to the
     petition, and the state court record lodged with the answer.

1    Petitioner timely filed a notice of appeal in the California Court of Appeal, Fifth

2    Appellate District ("Fifth DCA").  While this appeal was pending, Petitioner filed a petition for

3    writ of habeas corpus also in the appellate court on February 20, 2009.  On June 30, 2009, the

4    appellate court issued an order to show cause returnable in the superior court.  On July 7, 2009,

5    Petitioner returned to the superior court with a petition for writ of habeas corpus.  An evidentiary

6    hearing was held on December 4, 2009, and on December 29, 2009, the court denied relief.  On

7    March 12, 2010, Petitioner filed a petition for writ of habeas corpus in the Fifth DCA.  The court

8    denied relief on July 1, 2011.

9    On June 17, 2011, the Fifth DCA affirmed Petitioner's judgment in a reasoned decision.

10   Petitioner then filed a petition for review in the California Supreme Court.  On September 21,

11   2011, the petition was summarily denied.

12   On July 10, 2012, Petitioner filed the instant federal habeas petition in this Court.  After

13   conducting a preliminary review of the petition, on August 2, 2012, the Court dismissed Grounds

14   Two, Three, Four and Six from the petition.  On September 4, 2012, the Court ordered

15   Respondent to file a response to the petition on the following remaining claims: Ground 1) He

16   alleges a witness for the prosecution provided false testimony to the jury which the prosecutor

17   knew to be false, in violation of his constitutional rights; Ground 5) He claims the evidence was

18   insufficient to support the jury's finding, because a witness's testimony was physically

19   impossible or inherently unbelievable; Ground 7) He claims defense counsel rendered ineffective

20   assistance by failing to demonstrate to the jury that a witness was unbelievable; and Ground 8)

21   He alleges the prosecutor committed misconduct by failing to turn over Brady material to the

22   defense.  On January 10, 2013, Respondent filed an answer to the petition.  On January 25, 2013,

23   Petitioner filed a traverse.

24                                   **STATEMENT OF FACTS**[2]

25   The Fifth DCA summarized the facts of the case, as follows:

26

27   [2]The Fifth DCA's summary of the facts in its June 17, 2011, opinion is presumed correct. 28 U.S.C.
28   §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court
     adopts the factual recitations set forth by the Fifth DCA.

After an evening together at a dance club, Lamar Rufus and his cousin Curtis Rufus drove to a convenience store and parked their cars nearby.[3] Lamar stayed outside while Curtis went inside to buy some water. After Curtis saw people outside "scurrying around as if they were leaving hastily," he and Lamar started back to their cars. In an alley along the way, Curtis saw Johnson and Lenix walking toward them. He knew Johnson, with whom he had played basketball a few times and with whom Lamar had attended school. Johnson looked as if "he had had a couple of drinks," so Curtis, on the way by, "patted him on the chest, hey man, wake up."

FN3. In the interests of brevity and clarity, later references to the cousins Rufus will be by first names only.  References to other witnesses will be by last names.

Once Johnson and Lenix were behind Curtis and Lamar, Curtis heard a metallic object hit the ground. Lamar turned around and told him Lenix "dropped a .38." Curtis turned around and saw Lenix reach down and put something in his waistband. Curtis said, "Let's go." As soon as Curtis and Lamar got back to their cars, Deshonta Grayson was standing there telling them that some "East Side" people were "tripping." That made no sense to Curtis, since nobody he knew there was an "East Side" gang member. Again, he said, "Let's go." As he drove away, he saw Grayson open Lamar's car door. After he turned around a corner, he saw that Lamar's car was not behind him. He backed up and saw that Lamar was still talking to Grayson.

Suddenly Curtis saw "Lenix walk over and fire two, three shots" into Lamar's head. Lamar instantly fell in front of his car. Grayson and Lenix "hesitated for a split second" and started walking away. Curtis started driving toward them, intending to hit them with his car. Lenix began firing the gun in his direction. Grayson ran past his car. Another car pulled out of a connecting alley and stopped. As Lenix opened the passenger door, the car's dome light and Curtis's headlights illuminated the interior of the other car. Curtis saw Johnson at the wheel. Lenix got in, and Johnson drove away. In court, Curtis testified there was no doubt in his mind that Johnson was the driver of the other car.

(Resp't's Answer, Ex. A.)

## DISCUSSION

I.   <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  <u>Williams v. Taylor</u>, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Kern County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.     <u>Standard of Review</u>

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); <u>Harrington v. Richter</u>, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624 (2011); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003); <u>Williams</u>, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Lockyer</u>, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 592 U.S. at 412.  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA.  <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir.2009) (quoting <u>Wright v. Van Patten</u>, 552 U.S. 120, 125 (2008)); <u>Panetti v. Quarterman</u>, 551 U.S. 930 (2007); <u>Carey v. Musladin</u>, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision.  <u>Carey</u>, 549 U.S. 70; <u>Wright</u>, 552 U.S. at 126; <u>Moses</u>, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must

1  then consider whether the state court's decision was "contrary to, or involved an unreasonable

2  application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28

3  U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ

4  if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

5  question of law or if the state court decides a case differently than [the] Court has on a set of

6  materially indistinguishable facts."  Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

7  72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in

8  character or nature,' or 'mutually opposed.'"  Williams, 529 U.S. at 405 (quoting Webster's Third

9  New International Dictionary 495 (1976)).  "A state-court decision will certainly be contrary to

10 [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

11 governing law set forth in [Supreme Court] cases."  Id.  If the state court decision is "contrary to"

12 clearly established Supreme Court precedent, the state decision is reviewed under the pre-

13 AEDPA de novo standard.  Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

14      "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

15 the state court identifies the correct governing legal principle from [the] Court's decisions but

16 unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at

17 413.  "[A] federal court may not issue the writ simply because the court concludes in its

18 independent judgment that the relevant state court decision applied clearly established federal

19 law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411;

20 see also Lockyer, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility

21 fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

22 Court's] precedents."  Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists

23 could disagree on the correctness of the state courts decision, the decision cannot be considered

24 unreasonable.  Id.  If the Court determines that the state court decision is objectively

25 unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the

26 error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619,

27 637 (1993).

28      Petitioner has the burden of establishing that the decision of the state court is contrary to

5

1  or involved an unreasonable application of United States Supreme Court precedent.  Baylor v.

2  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

3  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

4  state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

5  Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

6        AEDPA requires considerable deference to the state courts.  "[R]eview under

7  § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

8  the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review."

9  Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations

10 by state courts are presumed correct absent clear and convincing evidence to the contrary."

11 Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a

12 state court factual finding is not entitled to deference if the relevant state court record is

13 unavailable for the federal court to review.  Townsend v. Sain, 372 U.S. 293, 319 (1963),

14 overruled by, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

15 II.    Review of Claims

16        A.   Introduction of False Testimony by Prosecution

17        In his first claim for relief, Petitioner alleges the prosecution committed misconduct by

18 permitting Curtis Rufus to testify falsely.

19        This claim was presented on direct appeal to the Fifth DCA.  The Fifth DCA denied the

20 claim in a reasoned decision. (Resp't's Answer, Ex. A.)  Petitioner then raised the claim to the

21 California Supreme Court in a petition for review.  The California Supreme Court denied the

22 claim without comment or citation of authority.  When the California Supreme Court's opinion is

23 summary in nature, the Court must "look through" that decision to a court below that has issued a

24 reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the

25 appellate court analyzed and rejected the claim as follows:

26        Johnson argues that the prosecutor committed misconduct at his third trial by
         letting the sole prosecution eyewitness lie on direct examination and evade ineffectual
27       direct examination. The Attorney General argues the contrary.

28        At all three of Johnson's trials, juries saw convenience store videotapes. Some,

Johnson notes, "showed the inside of the store with a clerk and customers moving about." Others, he observes, "showed [the store's] gas pumps with vehicles and people moving about." He argues that the most important videotape depicts the alley where the shooting occurred but that no videotape at any of his three trials shows "the alley from which the supposed getaway car emerges" or "the getaway car" either when "parked" or when "its driver got into the driver's seat."

At Johnson's third trial, the jury saw a videotape showing, as Curtis testified on direct examination, that he and Lamar walked down the alley, Johnson and Lenix walked down the alley, Lenix appeared to bend over and pick something up, Grayson walked in the direction of Lamar's car, Johnson walked in one direction as Lenix walked in the opposite direction, the headlights of a car went on, and Lenix got into the car, which left the area. (Peo.Exh.5.)

On cross-examination, Curtis opined that the "fuzzy" videotape was of "poor quality" so "you can't really zoom in and see people's faces." He then testified about "two people that got into the car on the video, the first one was Glen Johnson, the second one was Arthur Lenix." Asked, "Are you saying the video shows the driver getting into the car?," he answered, "You can see him walk over and get into the vehicle, yes, on the video." Asked, "Are you saying it shows the person actually getting into the car? Or does it just show somebody walking in that direction?," he replied, "I have seen the video with the person getting into the car, yes." Asked, "Where is that video?," he answered, "I don't know. But I have seen one. It was different than the video that was shown today. I have seen this video before, but there's another one that is a little more clearer than that one." Asked, "Are you aware of another video that shows that alley?," he replied in the affirmative, testifying he told a detective he saw one on May 20, 2002. "It was one that's a little more clear that didn't have the lines and the numbers on it," he added.

On that record, Johnson argues that "Curtis lied" when he testified he saw a videotape showing Johnson getting into the getaway car. "There was no such video," Johnson claims. "Had there been such a video, it would have been played at [his] first, second and third trials." The prosecutor, he argues, "knew there was no such video" and "knew Curtis's testimony about seeing such a video was false. [He] knew these things," he claims, because he was the prosecutor "at each of [Johnson's] trials, at each of Lenix's trials, at the preliminary hearing for [Johnson] and at the preliminary hearing for Lenix." Despite that, he argues, quoting *United States v. LaPage* (9th Cir.2000) 231 F.3d 488, the prosecutor "'sat silently as his witness lied, and sat silently as his witness evaded defense counsel's ineffectual cross-examination.'" (*Id.* at p. 492.)

The centerpiece of Johnson's argument is *Napue v. Illinois* (1959) 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, which held that the failure of a prosecutor to correct a witness's testimony he knew to be false, even though the prosecutor did not solicit the falsity, and even though the falsity went only to the credibility of the witness, was a due process denial requiring reversal of the judgment since the falsity may have affected the outcome of the trial. (*Id.* at pp. 265–272.) *People v. Dickey* (2005) 35 Cal.4th 884, 28 Cal.Rptr.3d 647, 111 P.3d 921, he adds, applied the rule, "When the prosecution fails to correct testimony of a prosecution witness which it knows or should know is false and misleading, reversal is required if there is *any reasonable likelihood* the false testimony could have affected the judgment of the jury," but affirmed the judgment since there was "no reasonable likelihood the false impression created by [the witness's] testimony could have affected the judgment." (*Id.* at pp. 909–910, 28 Cal.Rptr.3d 647, 111 P.3d 921, italics in original.)

The fatal flaw in Johnson's argument is his failure to show the prosecutor knew or should have known Curtis's testimony was false or misleading. He notes, for example, the

court asked his attorney, at his second trial, if a defense exhibit was a "conglomerate of all of the videos taken at the scene on the date in question," his attorney answered "yes," and the prosecutor "did not disagree." That, he argues, shows the prosecutor "*implicitly* acknowledged" that "there were no others." (Italics added.) That is conjecture, not proof. The prosecutor might have been taking notes or reviewing his file at that moment and might not have even heard the question and answer on which Johnson now relies.

Finally, even if Curtis was wrong about seeing another videotape, Johnson fails to show how that aspect of his testimony could have affected the judgment. The videotape the jury saw at trial corroborated other aspects of his testimony. In argument to the jury, his attorney vigorously challenged Curtis's credibility. Even without the testimony he calls a lie, the juries at both his first and second trials found him guilty of second degree murder, conspiracy to commit murder, and accessory to murder just as the jury at his third trial did. His argument is meritless.

(Resp't's Answer, Ex. A (footnotes omitted).)

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)). Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982). "Improper argument does not, per se, violate a defendant's constitutional rights." Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996) (quoting Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir.1993)). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 ("Only if the argument were constitutional error would we have to decide whether the constitutional error was harmless.").

The knowing use of false or perjured testimony against a defendant to obtain a conviction

1   is unconstitutional.  Napue v. Illinois, 360 U.S. 264 (1959).  In Napue, the Supreme Court held

2   that the knowing use of false testimony to obtain a conviction violates due process regardless of

3   whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when

4   it appeared.  Id. at 269.  The Court explained that the principle that a State may not knowingly

5   use false testimony to obtain a conviction-even false testimony that goes only to the credibility of

6   the witness-is "implicit in any concept of ordered liberty."  Id.  Nevertheless, simple

7   inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted

8   the admission of false testimony.  United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995).

9   "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies."

10  Id.

11          In this case, it is clear that the state court's determination was not contrary to or an

12  unreasonable application of the above standard.  As noted by Respondent, the appellate court

13  determined that "[t]he fatal flaw in [Petitioner's] argument is his failure to show the prosecutor

14  knew or should have known Curtis's testimony was false or misleading." (Resp't's Answer, Ex.

15  A, at *11.)  The appellate court determined that Petitioner's claim that the prosecutor implicitly

16  acknowledged there were no other videos was "conjecture, not proof."  (Id.)  From the record,

17  there is no evidence that the prosecutor knew there were no other videos.  Further, it is not

18  unreasonable to conclude that the prosecutor believed the witness was confused between the

19  original recording he had viewed years earlier and the current video which had degraded over

20  time.  In any case, the prosecutor brought the discrepancy to the trial court's attention. Therefore,

21  the state court's conclusion cannot be found to be unreasonable.

22          Moreover, Petitioner fails to demonstrate that Curtis's testimony had a substantial or

23  injurious effect in determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 623

24  (1993).  The state court determined that even if Curtis lied about the second videotape, based on

25  the strength of the evidence and the fact that the first video shown to the jury largely corroborated

26  Curtis's testimony, Petitioner failed to show that Curtis's testimony regarding the second video

27  could have had any effect on the outcome of the trial.  Petitioner makes no showing otherwise.

28  Thus, the state court's conclusion was not unreasonable.  The claim should be denied.

1

B. Sufficiency of the Evidence

2

Petitioner next claims the evidence was insufficient to support the murder conviction.

3

This claim was also presented on direct appeal to the Fifth DCA where it was denied in a

4

reasoned decision. (Resp't's Answer, Ex. A.)  It was then raised before the California Supreme

5

Court where it was summarily denied.  Accordingly, the Court must "look through" to the

6

decision of the Fifth DCA.  Ylst, 501 U.S. at 804-05 & n. 3.  In rejecting the claim, the Fifth

7

DCA stated:

8

>     Johnson claims insufficiency of the evidence. The Attorney General argues the
> contrary.

9

10

>     Our role on a challenge to the sufficiency of the evidence is limited. (*People v.
> Ochoa* (1993) 6 Cal.4th 1199, 1206, 26 Cal.Rptr.2d 23, 864 P.2d 103 (*Ochoa* ).) Our duty
> is to review the whole record in the light most favorable to the judgment, to presume in

11

> support of the judgment every fact a reasonable trier of fact could reasonably deduce from
> both circumstantial and direct evidence, and to determine whether the record discloses

12

> substantial evidence - credible and reasonable evidence of solid value - such that a
> reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.

13

> (*People v. Prince* (2007) 40 Cal.4th 1179, 1251, 57 Cal.Rptr.3d 543, 156 P.3d 1015
> (*Prince* ).)

14

15

>     On a due process challenge to the sufficiency of the evidence, the "critical
> inquiry" is "to determine if the record evidence could reasonably support a finding of
> guilt beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318, 99 S.Ct.

16

> 2781, 61 L.Ed.2d 560.) That inquiry does not require the reviewing court to "'ask itself
> whether *it* believes that the evidence at the trial established guilt beyond a reasonable

17

> doubt'" but only to ask itself "whether, after viewing the evidence in the light most
> favorable to the prosecution, *any* rational trier of fact could have found the essential

18

> elements of the crime beyond a reasonable doubt." (*Id.* at pp. 318–319, italics in original.)

19

>     Our inquiry begins with a review of the record by the usual rules on appeal for a
> challenge to the sufficiency of the evidence. (*Ochoa, supra,* 6 Cal.4th at p. 1206, 26

20

> Cal.Rptr.2d 23, 864 P.2d 103.) After an evening together at a dance club, Lamar Rufus
> and his cousin Curtis Rufus drove to a convenience store and parked their cars nearby.

21

> Lamar stayed outside while Curtis went inside to buy some water. After Curtis saw
> people outside "scurrying around as if they were leaving hastily," he and Lamar started

22

> back to their cars. In an alley along the way, Curtis saw Johnson and Lenix walking
> toward them. He knew Johnson, with whom he had played basketball a few times and

23

> with whom Lamar had attended school. Johnson looked as if "he had had a couple of
> drinks," so Curtis, on the way by, "patted him on the chest, hey man, wake up."

24

25

>     Once Johnson and Lenix were behind Curtis and Lamar, Curtis heard a metallic
> object hit the ground. Lamar turned around and told him Lenix "dropped a .38." Curtis

26

> turned around and saw Lenix reach down and put something in his waistband. Curtis said,
> "Let's go." As soon as Curtis and Lamar got back to their cars, Deshonta Grayson was
> standing there telling them that some "East Side" people were "tripping." That made no

27

> sense to Curtis, since nobody he knew there was an "East Side" gang member. Again, he
> said, "Let's go." As he drove away, he saw Grayson open Lamar's car door. After he

28

> turned around a corner, he saw that Lamar's car was not behind him. He backed up and

saw that Lamar was still talking to Grayson.

Suddenly Curtis saw "Lenix walk over and fire two, three shots" into Lamar's head. Lamar instantly fell in front of his car. Grayson and Lenix "hesitated for a split second" and started walking away. Curtis started driving toward them, intending to hit them with his car. Lenix began firing the gun in his direction. Grayson ran past his car. Another car pulled out of a connecting alley and stopped. As Lenix opened the passenger door, the car's dome light and Curtis's headlights illuminated the interior of the other car. Curtis saw Johnson at the wheel. Lenix got in, and Johnson drove away. In court, Curtis testified there was no doubt in his mind that Johnson was the driver of the other car.

Johnson's argument has two facets. The first is his characterization of Curtis's testimony as "physically impossible and inherently improbable." He points out that a convenience store videotape shows neither the car's dome light nor Curtis's headlights illuminating the interior of the other car. He asserts that the distance was too great for Curtis to have seen the driver of the other car. He hypothesizes that even if "Curtis could have gotten a glimpse of the driver, he could not have focused on the driver's face given the stress he was under." Finally, he notes that at Johnson's third trial (but at neither of his other trials) Curtis testified that in a videotape with different camera angles than the one shown at trial he saw Johnson getting into the driver's seat of the other car.

The jury, however, resolved against Johnson the issue of Curtis's credibility as a witness. Issues of witness credibility do not affect the rule of appellate review that "when the circumstances surrounding the identification and its weight are explored at length at trial, where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court." (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497, 263 Cal.Rptr. 328 (*Gustavo M.*).)

Johnson, however, argues that the eyewitness in *Gustavo M.* "had close contact with the culprit; she spoke with him and even studied his face for distinctive marks so he could later be found." That eyewitness, however, identified a stranger. Curtis identified an acquaintance, a person with whom he used to play basketball and his cousin used to attend school. If there is substantial evidence of eyewitness identification, even if slight in comparison with contradictory evidence, the judgment will be affirmed. (*Gustavo M., supra*, 214 Cal.App.3d at p. 1497, 263 Cal.Rptr. 328.) Another factor here, as in *Gustavo M.*, is "'the inescapable fact of in court eyewitness identification. That alone is sufficient to sustain the conviction.'" (*Ibid.*, quoting *People v. Hughes* (1969) 271 Cal.App.2d 288, 291, 76 Cal.Rptr. 369.) Although an appellate court can overturn a judgment if supporting evidence "was 'inherently improbable,' such a finding is so rare as to be almost nonexistent." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 728, 118 Cal.Rptr.3d 270.) On the record here, Johnson fails to persuade us that his is so rare a case.

The second facet of Johnson's argument is, "even if [he] is wrong and there is substantial evidence that he was the driver of the car in which the killer fled the crime scene," there is an insufficiency of the evidence "that the killer gave him advance notice of his plan to kill Lamar or that [Johnson] entered into any conspiracy to murder Lamar." He posits alternative scenarios that, even if a conspiracy did exist, he "may only have given Lenix his word that he would help Lenix flee after Lenix killed someone other than Lamar" or "that he would help Lenix flee after Lenix committed some crime other than and lesser than murder."

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the

11

1    conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416, 84 Cal.Rptr.2d 665, 975
     P.2d 1071.) Circumstantial evidence often is the only means of proof. (*In re Nathaniel C.*
2    (1991) 228 Cal.App.3d 990, 999, 279 Cal.Rptr. 236.) Since proof of an express
     agreement to commit an offense is not necessary, evidence of a conspiracy is sufficient if
3    the conduct, relationship, interests, and activities of the alleged conspirators support an
     inference of a tacit mutual understanding to commit a crime. (*People v. Cooks* (1983) 141
4    Cal.App.3d 224, 311, 190 Cal.Rptr. 211.)

5           That is the state of the record here. Shortly before the killing, Johnson and Lenix
     walked down the alley together. After Johnson and Lenix walked past Curtis and Lamar,
6    Lenix dropped a .38 onto the ground, reached down, and put something (inferentially the
     gun) into his waistband. Once Curtis and Lamar got back to their cars, Curtis drove off.
7    After Grayson engaged Lamar in conversation, Lenix walked over and shot him two or
     three times in the head. Moments later, Johnson drove a car into the alley, Lenix got in,
8    and Johnson drove him away. The jury found two overt acts true. On that record, the
     evidence is sufficient to support the inference of an express or tacit mutual understanding
9    to murder Lamar. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135, 36 Cal.Rptr.2d 235,
     885 P.2d 1.)

10
            In summary, a sufficiency of the evidence is in the record of second degree
11   murder, conspiracy to commit murder, and accessory to murder. Johnson's argument is
     basically a request that we reweigh the facts. That we cannot do. (*People v. Bolin* (1998)
12   18 Cal.4th 297, 331–333, 75 Cal.Rptr.2d 412, 956 P.2d 374.)

13   (Resp't's Answer, Ex. A (footnotes omitted).)

14          The law on claims of insufficiency of the evidence is clearly established.  The United

15   States Supreme Court has held that when reviewing an insufficiency of the evidence claim, a

16   court must determine whether, viewing the evidence and the inferences to be drawn from it in the

17   light most favorable to the prosecution, any rational trier of fact could find the essential elements

18   of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

19   Sufficiency claims are judged by the elements defined by state law.  Id. at 324 n.16.  On federal

20   habeas review, AEDPA requires an additional layer of deference to the state decision.  Juan H. v.

21   Allen, 408 F.3d 1262, 1274 (9th Cir.2005).  This Court must determine whether the state decision

22   was an unreasonable application of the Jackson standard.

23          Here, Petitioner first argues that Curtis's identification of Petitioner was "physically

24   impossible or inherently improbable."  (Petition, at 8.)  He claims Curtis could not have

25   positively identified him as the driver of the car because the car door was only open for two

26   seconds, Curtis was more than 60 feet from the car, Lenix had just fired his gun at Curtis which

27   drew Curtis's attention, and Cu rtis was in shock after witnessing his cousin murdered.

28   However, the jury resolved the question of Curtis's credibility with respect to the identification

against Petitioner.  As the appellate court determined, Petitioner was essentially requesting the reviewing court to reweigh the facts which was beyond the scope of review, and is certainly beyond the scope of federal habeas review here.

As to Petitioner's claim that there was insufficient evidence to support the finding that Petitioner entered into any conspiracy, the appellate court determined there was sufficient evidence to support an inference of an express or tacit mutual understanding to murder the victim.  The court noted the evidence showed Petitioner and Lenix walked down the alley together when Lenix dropped a .38 handgun on the ground and returned it to his waistband.  The court noted that Grayson distracted the victim in conversation while Lenix came up behind him and shot him two or three times in the head. Then moments later, Petitioner drove a car up the alley whereupon Lenix got in and they left.  Viewing the evidence in the light most favorable to the prosecution, the state court's finding that sufficient evidence supported an inference of an express or tacit mutual understanding to murder the victim was not unreasonable.

Petitioner fails to demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or an "unreasonable determination of the facts in light of the evidence."  28 U.S.C. § 2254(d). The claim should be rejected.

C.  Ineffective Assistance of Counsel

Petitioner next claims defense counsel rendered ineffective assistance by failing to demonstrate to the jury that there was no other video of the crime as testified to by Curtis, that Curtis did not identify Petitioner as the driver, and that Curtis could not be believed given evidence that he was on probation and subject to police pressure.

Petitioner first raised his claim of ineffective assistance of counsel on direct appeal to the Fifth DCA.  While the appeal was pending, Petitioner filed a habeas petition in the Fifth DCA, also raising a claim of ineffective assistance.  The appellate court issued an order to show cause returnable in the superior court.  Petitioner then filed a habeas petition in the superior court raising a claim of ineffective assistance of counsel.  The superior court conducted an evidentiary hearing and on December 29, 2009, denied relief.  Petitioner then filed a second habeas petition

in the appellate court, but relief was summarily denied.  Thereafter, the appellate court affirmed

the judgment on direct appeal.  Petitioner then filed a petition for review in the California

Supreme Court, but the court summarily denied relief.  On federal habeas review, this Court must

"look through" to the last reasoned decision.  Ylst, 501 U.S. at 804-05 & n. 3.  Here, the superior

court rendered the last reasoned decision as to claims which relied on evidence presented outside

the appellate record, namely evidence presented at the evidentiary hearing.  The superior court

denied the claim as follows:

> The next issues to be resolved relate to the allegations of ineffective assistance of
> counsel.  In the context of the pleadings, these issues are the converse of what was
> discussed herein above relating to prosecutorial misconduct.  If the prosecutor did not
> commit misconduct, then defense counsel was ineffective for not raising or exploiting the
> same issues.  As noted above, the underlying issue of IAC was not directly contested by
> the respondent and is considered admitted.  However, notwithstanding the ruling of *In re
> Serrano* (1995) 10 Cal.4th 447, 445-456, the test for ineffectiveness of counsel is in two
> parts.  The second prong is a determination whether the IAC was prejudicial to petitioner.
> That is, in its absence was a more favorable outcome to petitioner probable. *Strickland v.
> Washington* (1984) 446 U.S. 668, 694.
>
> The first question is the failure to establish that a second video didn't exist.  Based
> on the evidence presented at the habeas hearing, and as already reasoned herein above, it
> is clear that this is inconsequential.  The fact there was no other video offered into
> evidence diffuses this issue greatly, if not totally.  As indicated above, this court is led to
> believe that a second video as identified by Rufus did not exist.  However, inquiry into
> this area would lead to further testimony that the original recording was viewed by Rufus
> at the Fastrip.  Rufus' position is that he could make out more on this recording than on
> the copies. Although Lt. Krueger might testify that he could not see any better on the
> original recording, the jurors would reasonably conclude that an original recording might
> be better than the one they were seeing.  This would only make Rufus more believable in
> describing what could be seen on the video played in court, particularly since he was
> familiar with the people present and witnessed things as the transpired.  In any event,
> neither side relied on this testimony in closing, and the defense requested the jury to
> closely look at the video to confirm Rufus was mistaken or lying.  As the defense pointed
> out in argument, things Rufus testified to seeing on the video were clearly not present.  It
> was established in the evidence, if not directly then circumstantially, no other video
> existed.
>
> The issue of whether Curtis Rufus identified or did not identify petitioner on the
> date of the incident has been amply discussed herein above.  It really does not appear to
> this court to be an issue of semantics.  Lt. Krueger established to this court in the hearing
> that there was in fact, an identification of petitioner being made as the driver throughout
> his interaction with Mr. Rufus.  Delving into the semantics of Krueger's report would
> have only emphasized the identification.  Although it could have been established that at
> certain points in the interview the report did not document by use of the word
> "identification", the overall purpose of taking a statement, viewing the recording, and
> showing of the yearbook was to identify the driver.  There is no other reasonable
> interpretation.
>
> Finally, the court is not convinced that raising the issue of Rufus' misdemeanor

probationary status would have any impact on the outcome of the trial.  It is questionable whether the trial court would even have allowed the evidence.  The conviction does not involve moral turpitude and there is no evidence that Rufus' conduct on the night of the incident violated any laws or any condition of his probation.  Furthermore, there was no evidence presented at the habeas hearing to establish Rufus was attempting to curry any favors from the police or was acting as an informant.

        In summary, accepting that defense counsel's performance was defective, the nature of his performance is not such that it creates a probability petitioner would have received a more favorable outcome.  This conclusion of the court is reached having considered the alleged acts of IAC both individually and collectively.

(Lodged Doc. No. 11 at 8-9.)

With respect to those claims presented relying on the appellate record, the Fifth DCA provided the last reasoned decision, as follows:

        Johnson claims ineffective assistance of counsel. The Attorney General argues the contrary.

        The right to counsel protects the due process right to a fair trial not only by guaranteeing "access to counsel's skill and knowledge" but also by implementing the constitutional entitlement to an "'ample opportunity to meet the case of the prosecution.'" (*Strickland v. Washington* (1984) 466 U.S. 668, 684–686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (*Strickland* ).) To establish ineffective assistance, the defendant must make a showing that counsel's performance "fell below an objective standard of reasonableness" and prejudiced the defense. (*Id.* at pp. 687–692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–217, 233 Cal.Rptr. 404, 729 P.2d 839 (*Ledesma* ).) To establish prejudice, the defendant must make a showing "sufficient to undermine confidence in the outcome" of a "reasonable probability" that but for counsel's performance "the result of the proceeding would have been different." (*Strickland, supra,* at pp. 693–694; *Ledesma, supra,* at pp. 217–218, 233 Cal.Rptr. 404, 729 P.2d 839.)

        While professing not to question "the skill or the dedication" of his attorney, Johnson argues that two categories of omissions establish ineffective assistance. First, he says, his attorney "failed to produce evidence that no video showed the car when it was parked or anyone getting in the parked car," failed to obtain "a stipulation that no such video existed," and failed to elicit from a detective "an admission that no such video existed." Had his attorney done so, he argues, the evidence that Curtis "lacked veracity or lacked the capacity to perceive events or store or retain memories properly would have undermined the prosecutor's case and prevented [his] conviction." We disagree.

        If the record fails to show the reason for an attorney's action or inaction, our duty is to affirm the judgment unless there could be no satisfactory explanation. (*People v. Anderson* (2001) 25 Cal.4th 543, 569, 106 Cal.Rptr.2d 575, 22 P.3d 347.) Here, the record not only fails to show why Johnson's attorney did not produce that evidence, obtain that stipulation, or elicit that admission but also invites the reasonable inference that doing so could have harmed the defense by drawing inappropriate attention to the possible existence of a videotape more prejudicial than the one the jury saw at trial. (See *People v. Johnson* (1993) 6 Cal.4th 1, 50, 23 Cal.Rptr.2d 593, 859 P.2d 673, criticized on another ground by *People v. Rogers* (2006) 39 Cal.4th 826, 879, 48 Cal.Rptr.3d 1, 141 P.3d 135.) The defendant has a duty to show that the challenged act or omission was not attributable to a tactical decision that a reasonably competent and experienced criminal defense attorney would make. (*People v. Gurule* (2002) 28 Cal.4th 557, 610–611, 123

1    Cal.Rptr.2d 345, 51 P.3d 224.) Johnson fails to make the requisite showing.

2         Second, Johnson argues, his attorney "failed to ask the court to strike certain overt
     acts and preclude proof on acts for which [he] had been acquitted." He challenges one
3    overt act the court dismissed by stipulation at his first trial, three overt acts the jury found
     not true at his second trial, and eight overt acts his attorney did not ask the court to strike
4    at his third trial on the grounds that four occurred before the conspiracy, one constituted
     the underlying crime, and three occurred after the underlying crime. He argues that if his
5    attorney had sought to strike all of those overt acts from the information, the jury would
     not have received the "prejudicial evidence" that there were four conspirators, not two,
6    and that Lenix tried to kill Curtis, too, and would not have received "a written summary
     of the prosecutor's theory of the case" that was "an annotated roadmap to conviction."
7
          As we rejected Johnson's argument about the videotape omissions solely on the
8    issue of counsel's performance, so we reject his argument about the overt act omissions
     solely on the issue of prejudice. (See *Strickland, supra,* 466 U.S. at p. 697.) Even if the
9    court had stricken all the overt acts he now challenges, two would have gone to the jury.
     The jury found both true. The law, however, requires only one. (*People v. Russo* (2001)
10   25 Cal.4th 1124, 1135, 108 Cal.Rptr.2d 436, 25 P.3d 641; §§ 182, subd. (b), 184.) To
     establish prejudice, Johnson has a duty to make an affirmative showing of a reasonable
11   probability, sufficient to undermine confidence in the outcome, that but for his attorney's
     unprofessional errors the result of the proceeding would have been different. (*In re Sixto*
12   (1989) 48 Cal.3d 1247, 1257, 259 Cal.Rptr. 491, 774 P.2d 164, citing *Strickland, supra,*
     at p. 694.) His entirely speculative arguments fail to make the requisite showing. (See
13   *Strickland, supra,* 466 U.S. at pp. 684–694, 697; *Ledesma, supra,* 43 Cal.3d at pp.
     216–218, 233 Cal.Rptr. 404, 729 P.2d 839.)
14
     (Resp't's Answer, Ex. A (footnotes omitted).)
15
          The law governing ineffective assistance of counsel claims is clearly established.  Canales
16
     v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging
17
     ineffective assistance of counsel, the court must consider two factors.  Harrington v. Richter,
18
     *supra*, 131 S.Ct. at 787; Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21
19
     F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was
20
     deficient, requiring a showing that counsel made errors so serious that he or she was not
21
     functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.
22
     The petitioner must show that "counsel's representation fell below an objective standard of
23
     reasonableness," and must identify counsel's alleged acts or omissions that were not the result of
24
     reasonable professional judgment considering the circumstances. Harrington, 131 S.Ct. at 787,
25
     (citing Strickland, 466 U.S. at 688); United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th
26
     Cir. 1995).  Petitioner must show that counsel's errors were so egregious as to deprive defendant
27
     of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688.  Judicial scrutiny of
28

counsel's performance is highly deferential.  A court indulges a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." Harrington, 131 S.Ct. at 787 (quoting Strickland, 466 U.S. at 687); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9ᵗʰ Cir.1994).

Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," Strickland, 466 U.S. at 694.  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" Harrington, 131 S.Ct. at 787 (quoting Strickland, 466 U.S. at 693).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Harrington, 131 S.Ct. at 787-788 (quoting Strickland, 466 U.S. at 687).  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Establishing that a state court's application of Strickland was unreasonable under 28 U.S.C. § 2254(d) is very difficult. Harrington, 131 S.Ct. at 788.  Since the standards created by Strickland and § 2254(d) are both 'highly deferential,' when the two are applied in tandem, review is 'doubly' so. Harrington, 131 S.Ct. at 788 (quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)).

In this case, with respect to those claims based on evidence presented at the evidentiary hearing in superior court, the state court properly applied the Strickland two-prong test.  The state court considered the evidence presented concerning the existence of a second video as testified to by Curtis and reasonably determined that Petitioner suffered no prejudice resulting from defense counsel's alleged ineffectiveness.  The court noted that further inquiry into the existence of a second video might have made Curtis more believable.  Whether or not there existed a second video, the jury viewed the first video and it was clear from that video that things that Curtis had testified to seeing were plainly not present.  Defense counsel highlighted these inconsistencies to the jury.  Further inquiry would not have aided the defense and could possibly have been

damaging.

Likewise, the state court rejection of Petitioner's claim concerning the identification of Petitioner as the driver was not unreasonable.  According to the superior court, it was clear that the purpose of Officer Krueger's interaction with Curtis was to identify the driver of the vehicle. Therefore, the defense had nothing to gain from further inquiry, and doing so would only have served to highlight the identification to the jury and further damage the defense.

With respect to Curtis' misdemeanor probationary status, the state court reasonably determined that raising this issue would have had no impact on the outcome of the trial.  There was no evidence that Curtis was in violation of probation, and there was no evidence that Curtis was attempting to curry favor with the police by implicating Petitioner.  Petitioner's claim is completely speculative.  In any case, the court found that the evidence would not have been admissible, since the misdemeanor conviction did not involve moral turpitude.

As to those claims of ineffective assistance which relied on the appellate record, the Fifth DCA applied Strickland and reasonably concluded that Petitioner failed to demonstrate that counsel's actions were not the result of reasonable trial tactics.  The appellate court noted that counsel could have made a tactical decision not to inquire further into the existence of second video since doing so could have harmed the defense by drawing attention to the possible existence of a second video even more damaging than the first, or at least an original version that was more clear than the copy viewed years later.  Even if defense counsel could have shown that Curtis lied or was mistaken about a second video, Petitioner suffered no prejudice since his testimony was largely corroborated by the first video.

The state court also found that Petitioner failed to demonstrate prejudice concerning his challenge to the conspiracy conviction.  The appellate court noted that even if the trial court had stricken all of the challenged overt acts, two overt acts would still have gone to the jury, and the jury found both to be true.  California law requires only one overt act be found true to sustain a conspiracy conviction.  Cal. Penal Code § 182(b); People v. Russo, 25 Cal.4th 1124, 1135 (2001).

Accordingly, Petitioner fails to demonstrate that the state court's determinations were

1    contrary to or an unreasonable application of <u>Strickland</u>.  The claim should be rejected.

2         D.  Prosecutorial Misconduct

3         Petitioner alleges the prosecutor committed misconduct by failing to turn over

4    <u>Brady</u> material to the defense, by failing to correct the record with respect to the existence of a

5    second video, and by failing to correct the testimony of Curtis Rufus which he knew to be false.

6         Petitioner raised these claims of prosecutorial misconduct by habeas petition to the Kern

7    County Superior Court.  On December 29, 2009, the superior court denied the claim in a

8    reasoned decision.  Thereafter, Petitioner presented the claims to the Fifth DCA and California

9    Supreme Court; however, those petitions were summarily denied.  This Court must review the

10   decision of the superior court as it was the last reasoned decision.  <u>Ylst</u>, 501 U.S. at 804-05 & n.

11   3.  The superior court rejected the claims as follows:

12        The first contention of prosecutorial misconduct evolves around the issue of
          whether Curtis Rufus saw the driver of the getaway car when the shooter entered, and
13        identified petitioner as the driver when shown the yearbook. Examination of the trial
          transcript reveals that the prosecutor did elicit from Rufus that the combination of the
14        interior light going on and his headlights illuminating the getaway car enabled him to see
          and identify the driver. Petitioner further alleges that Rufus' testimony that he identified
15        petitioner as the driver when shown the yearbook was false. Examination of the trial
          transcript again established that Mr. Norris did question Rufus regarding the
16        identification of petitioner in the yearbook. The testimony can be construed to establish
          that he was identifying the driver to Krueger at the time. In both instances, petitioner's
17        basis for claiming the aforesaid to be false evidence is simply that it is inconsistent with
          the contents of Krueger's report.
18
          As for the first contention, examination of petitioner's Exhibit 2 reveals the inside
19        of the car is illuminated and the driver appears to be wearing a white shirt, as testified to
          also by Lt. Krueger.  It is clearly possible, and likely under the circumstances, that Rufus
20        would see the driver.  As to the second contention, there is no dispute that Rufus did
          identify petitioner in the yearbook on the date of the crime. Lt. Krueger was examined on
21        these inconsistencies at the evidentiary hearing as noted above. He testified that it was
          his understanding Rufus was making an identification of the driver even though petitioner
22        was referenced in the report as "someone he knew and had seen in the alley prior to the
          shooting." It was his intent in authoring the report to reflect said identification, but did
23        not do so in words directly speaking to the issue.

24        This court finds his testimony credible, particularly in view of the contents of the
          report and the circumstances of his contact with Rufus at the time. The shooter was
25        identified in the same manner. Rufus recognized him, knew him only by a moniker, and
          identified him upon being shown a photo line-up. He knew petitioner, physically
26        contacted him in the alley, saw him with the shooter, saw the getaway car drive off
          viewing its occupants but couldn't recall his name. He did know his high school and year
27        of graduation. When shown the yearbook and making a positive identification, who was
          he identifying, if not the driver? Krueger's report reflects how the name of the driver
28        became known, which constitutes identification. Mr. Norris interpreted the report in the

                                              19

same fashion, and most importantly, Rufus' testimony was to the effect he was making an identification of the driver at the time. There is nothing inconsistent with the report and the testimony elicited by the prosecutor, and said interpretation of the meaning of the report is supported by the video and the other evidence.

The next contention is prosecutorial misconduct in the failure to correct the record as to the existence of a second video. This testimony was the product of cross-examination by the defense regarding what was visible on the video shown in court. Rufus testified he could see him walk over and get in the car on the video. When questioned more closely as to whether "it shows" someone getting into a car versus someone merely walking in that direction, he states he saw a different video a little more clear to him in 2002. He was questioned as to whether there was another video that shows the alley, and replied that there were several camera angles inside the store. The sidebar ensued and the nature of what occurred is set forth herein above in the testimony of Mr. Norris. The evidence at the habeas hearing was that Mr. Norris believed Rufus was mistaken, but could not be certain because he wasn't there at the Fastrip. Lt. Krueger testified that it was viewed on the store equipment with Rufus. Jim Ray testified to degradation that occurs and that there may have been better resolution on the store equipment.

This court finds it unreasonable to believe that a second video (within the meaning of the examination of the witness) depicting the alley exists, or that the original recording shows the driver entering the car. Petitioner correctly points out that the prosecution has a duty to take steps to correct a witness' known misstatements, even if they only go to credibility. However, reversal is required only where there is a reasonable likelihood it could have affected the judgment of the jury. *People v. Dickey* (2005) 35 Cal.4th 884. The facts and the circumstances in the instant case, however, do rise to this level. The prosecutor did not have a duty here to stipulate to a fact of which he could not be certain. The prosecutor believed the witness was mistaken and not that he was lying. Mr. Norris' belief was reasonable under the circumstances. The original viewing by the witness was years ago, as was the previous trial. The video certainly points to the conclusion petitioner entered the car to the right side of the video. It is not unreasonable to believe the witness was making an honest mistake. Most importantly, Mr. Norris did in fact take steps to remedy the situation, if necessary. He reported his belief to the court and defense counsel, and was seemingly open to any suggested solution at the time. The defense did not think it was significant enough to further address, and true to his word the existence of another video was not mentioned in argument by Norris. Both attorneys argued the video *admitted into evidence* supported their respective positions. The defense took advantage of the misstatement by imploring the jury to view the video in deliberations which would prove Rufus was lying, as many things he reported seeing do not exist in the video or were not even possible.

In summary, there is no evidence before this court to indicate under any of the circumstances presented herein above, the prosecutor would have reason to believe he was adducing false testimony. Furthermore, he acted appropriately in response to the "second video" issue based on this court's evaluation of the trial record and the evidence presented in the habeas hearing. The petition is denied on these ground of prosecutorial misconduct.

The final prosecutorial misconduct issue rests on the presumption that Mr. Norris withheld information that Curtis Rufus was on court probation and seeking to curry favors from the police by implicating petitioner. There was no evidence presented to this court that the defense was not aware of Rufus' probationary status for driving on a suspended license stemming from two convictions which occurred in 2002. Information that was easily obtainable by anyone through the clerk's office or on the internet, as

1    pointed out by petitioner.  Suggestions that he was currying favors or working as an
2    informant are conclusory, no evidence having been presented to support them.  The
     petition is denied on this ground of prosecutorial misconduct, as well.

3    (Lodged Doc. No. 11 at 6-8.)

4         As previously stated, a petitioner is entitled to habeas corpus relief if the prosecutor's

5    misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of

6    due process."  Donnelly, 416 U.S. at 643.  To constitute a due process violation, the prosecutorial

7    misconduct must be "of sufficient significance to result in the denial of the defendant's right to a

8    fair trial."  Greer, 485 U.S. at 765 (quoting Bagley, 473 U.S. 667).  Any claim of prosecutorial

9    misconduct must be reviewed within the context of the entire trial.  Id. at 765-66.  If

10   prosecutorial misconduct is established, and it was constitutional error, the error must be

11   evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619

12   (1993).

13        In this case, it is clear that the state court's determination was not contrary to or an

14   unreasonable application of the above standard.  First, as to Petitioner's allegations that the

15   prosecutor failed to disclose criminal records concerning witness Curtis Rufus, the state court

16   held an evidentiary hearing, reviewed the trial record and evidence presented at the hearing, and

17   concluded that "[t]here was no evidence presented to this court that the defense was not aware of

18   Curtis' probationary status for driving on a suspended license stemming from two convictions

19   which occurred in 2002."  (Lodged Doc. No. 11 at 8.)  The court noted that the information was

20   readily available to the defense.  In addition, the court found that any suggestion the witness was

21   currying favor or working as an informant to the police was conclusory and unsupported.  The

22   state court's finding is entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1), and

23   Petitioner fails to overcome that presumption.

24        Concerning the claim that the prosecutor failed to correct the record regarding the second

25   video, the state court held an evidentiary hearing wherein the prosecutor testified about the

26   videotape's existence.  The court found the prosecutor acted properly.  Given the length of time

27   between the witness's initial viewing of the videotape and his testimony at Petitioner's third trial,

28   the court found the prosecutor was credible in his belief that the witness was merely mistaken in

his claim of viewing a different videotape.  This determination was not unreasonable.  Moreover, even if the prosecutor's failure to correct the record could be considered misconduct, the prosecutor took steps to remedy the situation.  He notified the court and defense counsel of his belief and stated he was open to any suggestions for remedy.

As to Petitioner's claim that the prosecutor failed to correct Curtis' testimony that Curtis had seen Petitioner in the getaway vehicle when Lenix opened the passenger door, the state court held an evidentiary hearing wherein the detective and the prosecutor testified.  The state court noted that in viewing Petitioner's Exhibit 2, the inside of the vehicle was illuminated, and under the circumstances it was "clearly possible, and likely" that Curtis viewed the driver.  (Lodged Doc. No. 11 at 6.)  The court concluded that "[t]here is nothing inconsistent with the report and the testimony elicited by the prosecutor, and said interpretation of the meaning of the report is supported by the video and the other evidence." (Lodged Doc. No. 11 at 6-7.)  Again, Petitioner's arguments fail to overcome the presumption of correctness of the state court's factual finding. 28 U.S.C. §§ 2254(d)(2), (e)(1).

In sum, Petitioner fails to demonstrate the state court rejection of his claims of prosecutorial misconduct was contrary to, or an unreasonable application of, clearly established Federal law, or that the state court rendered a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). The claim should be denied.

III.   Evidentiary Hearing

In his traverse, Petitioner requests an evidentiary hearing.  He contends the claims cannot be adequately reviewed without a hearing insofar as no state or federal court has held an adequate factual investigation.  Petitioner's contention is not well-taken.  First, contrary to Petitioner's representations, a full evidentiary hearing was in fact held in the Kern County Superior Court on December 4, 2009.  (Lodged Doc. No. 11.)  Second, all of Petitioner's claims were considered and adjudicated on the merits at one point or another in the state courts.  A federal evidentiary hearing is unnecessary where, as here, the claims may be resolved on the existing record.  Schriro v. Landrigan, 550 U.S. 465, 474 (2007).  Moreover, the Supreme Court recently held that when

reviewing claims under § 2254(d), provided the claims were adjudicated on the merits in state court proceedings, a reviewing federal habeas court is restricted to the record that was before the state courts at the time the decision was rendered.  <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1392 (2011).  Since Petitioner's claims were adjudicated on the merits, Petitioner is not entitled to an evidentiary hearing.

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH PREJUDICE.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:** _____**February 15, 2013**_____          _____**/s/ Barbara A. McAuliffe**_____
                                          UNITED STATES MAGISTRATE JUDGE